IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Kimberly Clark,                                  Case No. 18 CV 11673

                              Plaintiff,         ORDER DENYING
                                                 <u>SUMMARY JUDGMENT</u>
          -vs-
                                                 JUDGE JACK ZOUHARY
City of Center Line, et al.,

                              Defendants.


## INTRODUCTION

In April 2018, officers of the City of Center Line Police Department broke down Derrick
Clark's front door with a battering ram.  Derrick was not home; but his mother, Plaintiff Kimberly
Clark, was.  Within the next several minutes, the Center Line officers fatally shot Derrick's two
black labs and arrested Kimberly, allegedly breaking her arm in the process.  She asserts two claims
under 42 U.S.C. § 1983: excessive force against Defendants Detective Michael Gerald and Officer
Andrew Percha, and failure to train against Center Line.  This Court must now determine whether
the constitutionality of Defendants' conduct is appropriate for a jury to decide.

## FACTS

Kimberly was living at her son's house on Theisen Street in Center Line, Michigan in the
days leading up to her arrest (Doc. 25-5 at 14).  Officers were investigating her son for possible
felonies (Doc. 25-2 at 3).  While surveilling the home, Gerald and his partner observed Kimberly
and the dogs inside (Doc. 25-3 at 4).  The officers allegedly attempted to make contact, but were

unsuccessful (*id.* at 6). They ultimately obtained a search warrant for the house (*id.*). Prior to executing the warrant, Gerald ran a law-enforcement network search on Kimberly that revealed an outstanding warrant for a nonviolent misdemeanor in Fraser, Michigan (*id.* at 4–5). He was apparently familiar with Kimberly. Based on his listening to "countless hours of jail calls between [Kimberly] and her son," Gerald remarked to a colleague that she was a "disgusting asshole" (*id.* at 16).

On April 25, Gerald and Percha, along with several other Center Line officers and two animal-control officers, arrived at the house (*id.* at 6). They observed the dogs aggressively barking in the front window (*id.* at 6). Defendants claim they repeatedly knocked on the front door and announced their presence (*id.*). Kimberly does not directly dispute that the officers knocked on the door; she claims she did not hear any knocking because she was sleeping in a back bedroom with a television on and fan running. (Doc. 25-5 at 18–19). Eventually, the officers broke down the front door (Doc. 25-3 at 6). Gerald and an animal-control officer entered first and managed to chase the dogs into the back bedroom and shut the door (*id.* at 6–7). Defendants claim they continued to announce their presence as they searched the house (Doc. 25-4 at 10). Kimberly claims she awoke only after the dogs were shut into the room with her, and claims she never heard the officers announce themselves (Doc. 25-5 at 18–19). She believed the home was being burglarized and stayed quietly in the back bedroom (*id.* at 21). After about ten minutes of searching, the officers approached the back bedroom, where they believed Kimberly was hiding (Doc. 25-3 at 7).

The accounts of what took place over the next approximately 20 seconds differ significantly. According to Defendants, they asked Kimberly to exit the bedroom (*id.*). The animal-control officer entered the bedroom in an attempt to snare one of the dogs, but he immediately exited after seeing Kimberly behind the door (*id.*). Gerald then entered the room, with Percha right behind him (Doc. 25-4 at 6). One dog lunged, prompting Gerald to shoot it (Doc. 25-3 at 8). Gerald then grabbed

2

Kimberly by her upper right arm with his left hand, pulled her into the hallway and "placed" her against the wall (Doc. 25-4 at 5). Kimberly offered "very little" resistance" (Doc. 25-3 at 8–9). After Kimberly had been "placed" against the wall, Percha grabbed her left arm with his left hand (Doc. 25-4 at 6). Percha claims he and Gerald "held her arms" while another officer handcuffed her (*id.* at 12). During this process, the second dog "came into the hallway," prompting an officer to shoot it (*id.* at 13).

From Kimberly's perspective, the encounter unfolded quite differently. She never heard the officers announce themselves or command her to leave the bedroom (Doc. 25-5 at 20). She called her son's father, and placed him on speaker phone "so he could hear everything that was going on" (*id.* at 18–19). She then stood behind the door "to listen to see who was in the house" (*id.* at 21). Contrary to the officers' account, the first dog never lunged at Gerald and the officers did not merely "place" Kimberly against the wall. (*id.* at 19, 24). Rather, after shooting the dog, the officer grabbed Kimberly "from behind the door and had [her] in the hallway and [was] hitting [the] left side of [her] body up against the bathroom doorjamb" (*id.* at 19). Kimberly asked, "what are you doing?" (*id.* at 27). The officer "jammed" her into the doorjamb "again real hard." (*id.*). A second officer asked, "Do you want me to tase that bitch?" (*id.* at 26). Then, at some point while Kimberly was facing the wall, the second dog stepped down from the bed, and an officer shot it from the hallway (*id.* at 36). After she was handcuffed, Kimberly overhead the animal-control officer tell Defendants that if they would have given him "five more minutes, [he] would have had . . . the dog contained" (*id.* at 25). As the officers walked Kimberly to a police car, she repeatedly told them that they had broken her arm (*id.* at 28).

Upon arrival at the Fraser Police Department, officers found Kimberly crying in the back of the car (*id.*). They sent her to the hospital, where she was treated for a fractured humerus (Doc. 28-5). Kimberly then initiated this suit in May 2018. Two months later, she was charged with

3

resisting arrest and obstruction of justice for what took place during her arrest; she eventually pled no contest (Doc. 25-11).

## QUALIFIED IMMUNITY

"To state a claim under 42 U.S.C. § 1983, [Kimberly] must set forth facts that, when construed favorably, establish (1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law." *Brown v. Lewis*, 779 F.3d 401, 411 (6th Cir. 2015) (citation omitted). Defendants move for summary judgment (Doc. 25) based on qualified immunity, which shields Defendants from liability unless "(1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" *Reich v. City of Elizabethtown*, 945 F.3d 968, 977–78 (6th Cir. 2019) (quoting *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018)). Qualified immunity protects government officials from liability under Section 1983 "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (citation and quotation marks omitted).

The question for this Court is whether the evidence, viewed in the light most favorable to Kimberly, would allow a juror to reasonably conclude Defendants engaged in conduct that was clearly established as unlawful. *See Quigley v. Tuong Vinh Thai*, 707 F.3d 675, 680 (6th Cir. 2013). Defendants maintain (1) Kimberly has failed to establish a constitutional deprivation, and (2) if such a deprivation did occur, the right violated was not clearly established (Doc. 25 at 21, 25). To be "clearly established, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Brown*, 779 F.3d at 412 (cleaned up). "While there does not have to be 'a case directly on point,' existing precedent must place the lawfulness of the particular [conduct] 'beyond debate.'" *Wesby*, 138 S. Ct. 577, at 590 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).

4

### EXCESSIVE FORCE

As a threshold issue, Defendants argue Kimberly's claim against Percha should be dismissed because she cannot identify him as the officer who pushed her into the doorjamb (Doc. 25 at 17). Kimberly testified that only one officer hit her against the doorjamb (Doc. 25-5 at 29), but argues that if Gerald did not do it, there is evidence in the record from which a reasonable jury could conclude Percha was responsible (Doc. 28 at 27). Both Gerald and Percha admit they were behind Kimberly when she was up against the wall (Docs. 25-3 at 9; 25-4 at 6). True, Kimberly may be unable to definitively identify which officer pushed her into the doorjamb, but Percha cannot escape liability merely because Kimberly was facing a wall, blind to the officers behind her. *See Binay v. Bettendorf*, 601 F.3d 640, 651 (6th Cir. 2010) (affirming denial of qualified immunity where the alleged facts demonstrated "a disputed issue of material fact as to whether [the officer] was personally involved in the conduct").

Moving on to the application of qualified immunity. To survive summary judgment on her claim against Gerald and Percha, Kimberly must demonstrate the force used during her arrest was "excessive." *Burgess v. Fischer*, 735 F.3d 462, 472 (6th Cir.2013). To determine whether force is excessive, this Court "appl[ies] an objective reasonableness test, looking to the reasonableness of the force in light of the totality of the circumstances confronting the defendants, and not to the underlying intent or motivation of the defendants." *Id.* There are three guiding factors: "(1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officer or others, and (3) whether [s]he is actively resisting arrest or attempting to evade arrest by flight." *Martin v. City of Broadview Heights*, 712 F.3d 951, 958 (6th Cir. 2013) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). Each of these factors favor Kimberly. Defendants were aware Kimberly was only wanted for a nonviolent misdemeanor (Doc. 25-3 at 5). Kimberly, a 52-year-old diabetic, was unarmed during the encounter (Doc. 25-5 at 8, 10). She posed no threat to

Gerald, an in-shape 37 year old (Doc. 25-3 at 5); or Percha, a muscular 45 year old (Doc. 25-4 at 3, 6).  Gerald admitted Kimberly did not attempt to "strike" him, "sit down and use dead weight," "flee," or otherwise actively resist (Doc. 25-3 at 9).  Under Kimberly's version of events, she never posed a danger to officers nor did she resist -- she was entirely compliant.  In spite of that compliance, an officer grabbed her and threw her into a doorjamb -- twice -- with enough force to fracture her arm (Doc. 25-5 at 27).  Kimberly's expert, who characterized these two hits against the doorjamb as "strikes," opined that her injury occurred "right there when she struck that hard surface wall" (Doc. 28-4 at 23).

Defendants are entitled to qualified immunity only if the undisputed facts, or evidence viewed in a light most favorable to Kimberly, fail to establish a prima facie violation of a clearly established constitutional right. *Turner v. Scott*, 119 F.3d 425, 428 (6th Cir. 1997).  A district court's "function at summary judgment is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Lopez v. City of Cleveland*, 625 F. App'x 742, 745 (6th Cir. 2015) (cleaned up).  The record leaves several genuine fact disputes unresolved.  Was Kimberly thrown into the doorjamb?  Once or twice?  If so, by which officer?  Were these "strikes" the cause of her broken arm?  These fact disputes are material to whether the officers' force was "excessive," and -- at this point -- they are resolved in Kimberly's favor.  *See id.* ("[C]ourts may not resolve genuine disputes of fact in favor of the party seeking summary judgment.").

Weighing the record in the light most favorable to Kimberly, this Court finds that qualified immunity does not bar her excessive-force claim.  First, at the time of the doorjamb strikes, Kimberly had already been "neutralized." *Baker v. City of Hamilton*, 471 F.3d 601, 607 (6th Cir. 2006).  Therefore, a reasonable jury could conclude the strikes were "unjustified and gratuitous." *Id.*  The Sixth Circuit has repeatedly held "that the use of force after a suspect has been incapacitated or neutralized is excessive as a matter of law." *Id.  See also Phelps v. Coy*, 286 F.3d 295, 301

(6th Cir. 2002) ("[T]here was simply no governmental interest in continuing to beat [plaintiff] after he had been neutralized, nor could a reasonable officer have thought there was."). The fact that Kimberly pled no contest to resisting and obstruction charges -- brought against her weeks after she filed this suit -- does not change this determination. *See Gottage v. Rood*, 533 F. App'x 546, 549 (6th Cir. 2013) ("Plaintiff's no contest plea to resisting arrest does not preclude him from advancing an excessive force claim based on that arrest.") (citing *Schreiber v. Moe*, 596 F.3d 323, 334 (6th Cir. 2010)).

Second, the disputed facts surrounding the doorjamb strikes preclude a finding that the officers' conduct was not clearly established as unconstitutional. Under Kimberly's version of the facts, she was not resisting and posed no threat to the officers at the time of the strikes. "Cases in this circuit clearly establish the right of people who pose no safety risk to the police to be free from gratuitous violence during arrest." *Griffith v. Coburn*, 473 F.3d 650, 659 (6th Cir. 2007) (citation omitted). *See also Lawler v. City of Taylor*, 268 F. App'x 384, 387 (6th Cir. 2008) (affirming the denial of qualified immunity to an officer who gratuitously struck a subdued arrestee and broke the arrestee's arm). Because "[t]here [is] significant Sixth Circuit case law support for [Kimberly's] right to be free from gratuitous strikes to [her] body, qualified immunity is not an available defense." *Baker*, 471 F.3d at 608. Kimberly's excessive-force claim against Gerald and Percha therefore proceeds to trial. *See Kindl v. City of Berkley*, 798 F.3d 391, 398 (6th Cir. 2015) ("We lack jurisdiction to review a summary judgment ruling on qualified immunity insofar as that order determines whether or not the pretrial record sets forth a genuine issue of fact for trial.") (cleaned up).

### MONELL

Kimberly next asserts a failure-to-train claim against Center Line under *Monell v. Departmentt of Social Services*, 436 U.S. 658 (1978). Her argument is simple: Center Line trained

its officers to use force "one level above" the force prescribed by the use-of-force continuum, and that is "excessive" by definition  (Doc. 28 at 29).  "When determining whether a municipality has adequately trained its employees, 'the focus must be on adequacy of the training program in relation to the tasks the particular officers must perform.'"  *Wright v. City of Euclid*, 962 F.3d 852, 881 (6th Cir. 2020) (quoting *Jackson v. City of Cleveland*, 925 F.3d 793, 834 (6th Cir. 2019)).  To succeed, Kimberly must show: (1) the policy was unconstitutional and (2) it was the "moving force" behind her injury.  *Id.* at 880.  She may do so by showing either "prior instances of unconstitutional conduct demonstrating that [Center Line] had notice that the training was deficient and likely to cause injury but ignored it," or "evidence of a single violation of federal rights, accompanied by a showing that [Center Line] had failed to train its employees to handle recurring situations presenting an obvious potential for such a violation."  *Jackson*, 925 F.3d at 836 (citation omitted).

Defendants first argue that any "failure-to-train" claim fails because Kimberly fails to outline an official policy that is unconstitutional (Doc. 25 at 30).  However, Gerald, who serves as a "trainer" for other officers with respect to Center Line's use-of-force policy, testified that officers "are trained to go one step above on the officer response" (Doc. 25-3 at 11).  This is "the way" he was trained with respect to the use of force, which he then "taught" to other officers (*id.* at 12).  As such, Center Line's use-of-force policy is "well settled as to constitute a 'custom or usage' with the force of law."  *Wright*, 962 F.3d at 880 (citation omitted).

A more difficult question is whether this policy "caused" Kimberly's injury.  Defendants assert they did not believe they were using "force" on Kimberly, which means -- even if the policy is unconstitutional -- there is no causal connection between the policy and her injury (Doc. 38 at 2).  They correctly note that under *Monell*, the policy or custom at issue must be the cause in fact and proximate cause of plaintiff's injury.  *Powers v. Hamilton Cty. Pub. Def. Comm'n*, 501 F.3d 592, 608 (6th Cir. 2007).  "At bottom, this is a causation inquiry, requiring the plaintiff to show that it

was the defendant's custom or policy that led to the complained of injury." *Id.*  Gerald testified that based on Center Line's use-of-force policy, officers could use "striking, aerosols, electronic devices and batons" against Kimberly -- even though she was "just standing there"  (Doc. 25-3 at 11–12).  He stated that "anything that is in this area of the continuum from striking, punching, kicking down, would be justified with that level of resistance" (*id.* at 12).  So, based on the evidence presented, could a reasonable jury conclude the use-of-force policy caused Kimberly's injury?

Kimberly answers yes; this Court agrees.  She points to *Wright v. City of Euclid*, in which plaintiff provided several examples of inappropriate memes and videos used in Euclid's police training program, some depicting officers gratuitously striking citizens.  962 F.3d at 880.  The Sixth Circuit concluded "that a reasonable jury could find that the City's custom surrounding use of force is so settled so as to have the force of law and that it was the moving force behind violations of [plaintiff's] constitutional rights."  *Id.* at 881.  This was true even though plaintiff never produced evidence that the officers were following a specific training protocol during the encounter.  Rather, the evidence demonstrated that the City had "a custom of permitting or acquiescing to the use of excessive force."  *Id.* at 880.  Same too here.  "A reasonable jury could find that [Center Line's] excessive-force training regimen and practices gave rise to a culture that encouraged, permitted, or acquiesced to the use of unconstitutional excessive force, and that, as a result, such force was used on [Kimberly]."  *Id.* at 881.  And based on the "likelihood that the situation [i.e., a situation requiring police arrest a compliant suspect] will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights," that jury could also conclude Center Line was deliberately indifferent to the "highly predictable consequence" of failing to properly train its officers.  *Jackson*, 925 F.3d at 836 (6th Cir. 2019) (quoting *Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 409  (1997)).

9

**CONCLUSION**

Several genuine fact disputes preclude the application of qualified immunity in this case. What took place during those 20 seconds in Kimberly's hallway, and Center Line's policy of employing force "one level above" what is necessary, as it may relate to Kimberly's injury, are questions that must be resolved by a jury.  Defendants' Motion (Doc. 25) is denied.

IT IS SO ORDERED.

_____*s/ Jack Zouhary*_____
JACK ZOUHARY
U. S. DISTRICT JUDGE

September 30, 2020